(No. 4095—)

STEPHEN MEGO, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed September 23, 1949.*

*Petition of Claimant for Rehearing denied September 19, 1950.*

HANSON AND DOYLE, Attorneys for Claimant.

IVAN A. ELLIOTT, Attorney General; ARCHIE T. BERNSTEIN, Assistant Attorney General, for Respondent.

SCHUMAN, C. J.

On August 1, 1947, claimant, Stephen Mego, 71 years of age, was in the employ of the respondent as a night attendant at the Chicago State Hospital, Chicago, Illinois, going to work at 11:00 P.M. in the evening. He was the sole attendant for about 100 patients in Ward No. DW-2. His duties were to take the temperature, pulse and respiration of sick patients, report fights, care for the untidy patients in the washroom, and awaken, wash and dress the patients for breakfast. About 5:30 in the morning of August 1, 1947, he was attacked by a patient of about 30 years old, who jumped on him from behind.

His assailant grabbed his necktie, and threw him to the floor. The necktie broke in half. The patient beat the head of Mr. Mego, and claimant received a few scratches. Claimant's glasses, lens and frame were smashed. Claimant was taken to the hospital for X-Rays; and the few scratches on his face were treated with mercurochrome; and he was then discharged. There was no direct injury to his eyes.

Dr. Poslusny, an optometrist, who had previously fitted claimant with glasses, testified that he examined claimant on August 2, 1947, the date after the attack, at which time his vision was the same as before; that he came back in two weeks and the eyes were the same; and that he came back on October 7, 1947 and the retina and the vitries were involved, and he sent him to the doctor, who had operated on him for the removal of cataracts; that on October 7, 1947 vision in the right eye was 20/200, and his left eye 20/50.

Claimant found after obtaining his new glasses that he could no longer read a newspaper or see at a distance, whereas prior to the attack he could distinguish a traffic light four blocks distant. Claimant went to the Illinois Eye and Ear Infirmary, and he obtained no relief there, in fact, his vision continued to grow worse. He was later recommended to the Civil Service Protective Association. Finally, on June 9, 1948, he obtained the services of Dr. Richard A. Perritt, his present oculist. Dr. Perritt prescribed various medicines and treatment. As a result, claimant's vision improved to a point where he can count fingers held before him at a distance of four feet, although his right eye remains with an uncorrected vision of less than 20/200, and his left eye remains with a vision of 20/200, any vision of 20/200 unaided and without glasses being considered industrial blindness.

It was stipulated that claimant was injured on August 1, 1947, while in the course of his employment by the respondent; that his salary was $1,740.00 annually, and in excess of $30.00 per week; that he was not married, and had no children under sixteen years of age; and that claimant had made no assignment or transfer of the present claim or any part thereof. It was further stipulated that claimant is and has been working for the respondent in the same capacity and at the same wages since the date of the accident, and that he lost no time or wages from his said employment by reason of the accident. It was further stipulated that claimant paid $185.00 for medical services; $49.15 for medicines; $35.00 for glasses, and, is continuing to pay the sum of $10.00 per week to Dr. Richard Perritt for medical care and treatment.

Dr. Louis Olsman, physician and surgeon on the staff of the Chicago State Hospital for the past ten years, except for four years service in the U. S. Army Medical Corps, testified he treated employees of the hospital under the employee's health service of which he had charge. He first treated claimant in 1939 for weakness of the left arm, leg and side of the face; the diagnosis was hemiparesis and hypertensive heart condition. Claimant's condition improved, and he was returned to duty. In 1940 Mr. Mego was again hospitalized for the same condition, together with dizziness and temporary loss of ability to speak. This latter condition was diagnosed as hemiplegia, transitory with hypertension. Dr. Olsman, due to absence from the hospital for military service, did not see claimant again until March 4, 1947, when Mr. Mego complained of symptoms of weakness, shortness of breath, and pain over his heart. Examination revealed, in addition to his previous findings of high blood pres-

sure and hypertensive heart disease, that he had retinal hemorrhages in both eyes. The diagnosis was hypertensive heart disease with coronary sclerosis and hypertensive retinopathy. The patient recovered sufficiently to return to his duties. He was again hospitalized on March 4, 1947, and at that time his symptoms were those of weakness, shortness of breath, and pain over heart; and the examination revealed high blood pressure and hypertensive heart disease, the presence of retinal hemorrhages in both eyes; and the diagnosis at the time showed hypertensive heart disease with coronary sclerosis and hypertensive retinopathy. However, on July 22, 1947, about a week before the assault, he was again admitted to the hospital complaining of dizziness and weakness. The diagnosis again was hypertensive heart disease. His blood pressure was two hundred over one hundred and twenty. On September 7, 1948 the claimant was again admitted to the employee's hospital with symptoms of pain of the heart, blood pressure 170/90, and had findings of auricular fibrilation, irregular heartbeat; and the diagnosis at that time was again that of hypertensive heart disease of coronary sclerosis. In addition to the foregoing periods of hospitalization, Dr. Olsman stated he treated Mr. Mego from time to time on an out-patient basis. During these latter examinations claimant's blood pressure varied from one hundred and eighty over one hundred to two hundred and ten over one hundred and twenty. Dr. Olsman added that on January 13, 1947, a board of three doctors, including himself, examined claimant finding him to have arteriosclerosis and hardening of the arteries. It was recommended that he be given an assignment to quiet service and light work where he would have constant supervision. Dr. Olsman stated claimant's work in Ward DW-2 on the evening he was

attacked was heavier and more strenuous work than had been advised for him. In this ward the patients are of the deteriorated, untidy and vegetative types, who have no control over their bodily functions or eliminations, and are chronically untidy.

Dr. Olsman attended Mr. Mego after aforesaid attack on August 1, 1947. He stated Mr. Mego suffered superficial lacerations on the side of his nose and right cheek, and a contusion to his left elbow. However, there was no evidence of injury to the eye proper.

Dr. Maurice D. Pearlman, chief resident physician in the Department of Ophthalmology at the Illinois Eye and Ear Infirmary, testified on behalf of the respondent. He stated that according to hospital records claimant was first treated at the Infirmary on March 22, 1941, and had cataracts removed from both eyes. Dr. Pearlman examined Mr. Mego's eyes on December 16, 1948, and found:

"My examination showed that the right eye had the vision of finger counting at about one to two feet. The eye was white, normal in external appearance, and the cornea showed a faint superficial density just off the center of the cornea. The anterial chamber was clear and deep. The iris was normal except for a surgical coloboma at the twelve o'clock position, and the lens was absent. The vitreous seemed to be fluid, and contained several large floating opacities. The retina and the choroid showed extensive degenerative changes in most portions. There were several small scattered hemorrhages present on the right eye. The optic nerve seemed atrophic. It was my conclusion the right eye was suffering the late degenerative changes due to severe myopia. The left eye had a corrected vision of twenty over one hundred which was not improvable. The left eye findings were very similar to that of the right eye. . . . Several small retinal hemorrhages were seen in the macular area in the left eye. It was my impression that the left eye had severe myopic retinopathy."

Dr. Pearlman further testified that if there was no direct trauma to the eye, but merely superficial cuts and breaking of glasses, it would be unlikely to result in retinal hemorrhages; that upon reviewing the record of

the claimant he believed that the left eye shows the same vision on October 3, 1947 as it showed on January 22, 1942, namely 20/100, and that with such vision he could only read the headlines of a newspaper.

On cross-examination, Dr. Pearlman testified that the claimant's condition from which he was suffering pertaining to his eyes was a degenerative process, and that that meant he was getting progressively worse; that his examination on December 16, 1948 compared with the report in the records as of April, 1942—there was no change in the vision of the left eye; that the hemorrhages that he noted on December 16, 1948 in the left eye were scattered about the macular area, which is the central portion of the retina, and would affect vision, but that claimant's vision was still 20/100; that from the examination on October 3, 1947 there was no hemorrhages reported, although they might have been present, because the hemorrhages reported were quite small. That hemorrhages, such as the ones he saw on December 16, frequently absorb and disappear, and if the hemorrhages were absorbed, the vision would be corrected; that hemorrhages to the retina, in order of frequency, are caused by diabetes, hypertension, arteriosclerosis, blood dyscrasis, myopic degeneration and other fundus degenerations, senility per se, septicemia, tumors of the eye, retinal detachments, glaucoma, and trauma; that retinal hemorrhages can be caused by psychic trauma with the presence of hypertension and arteriosclerosis; that the claimant attained his vision of 20/100 in his left eye in September of 1941, and that the claimant at that time had myopic choroiditis, which condition is an irreversible situation; that hemorrhages could occur in such a condition; that if hemorrhages were responsible for the vision of 20/100 and if the retina was otherwise in good

shape, the vision could improve; that the claimant was suffering from severe diseases with reference to his eyes; that he had severe myopia and also hypertension, and that myopia could cause hemorrhages, and hypertension could cause hemorrhages, and senility could cause hemorrhages, and his conclusion was that the claimant's eyes were the result of compound causes; that trauma could aggravate hypertension and cause a hemorrhage; that the hemorrhages that he found on December 16, 1948 could not have existed in a more extensive form, because he could have detected evidence of absorption of a previous larger hemorrhage; and that in his opinion the claimant's condition found on December 16, 1948 was stationary, and that if claimant's hypertension would drop for one reason or the other the hemorrhage might disappear; that it was his opinion that a man should have a vision of at least 20/40 to read a newspaper without a magnifying glass.

The opinion of Dr. Pearlman was that the claimant had the same vision in his left eye after the attack as he had before.

Dr. Perritt testified that he examined the claimant on June 9, 1948, and that his examination revealed that in the right eye the acuity was finger vision at approximately one foot; that in the left eye uncorrected the visual acuity was 20/200, correctible to 20/100 with glasses that he was wearing; that the fundus examination of both eyes revealed myopic changes of the disk, or the optic nerve. On page 118 of the record he stated that no hemorrhages or exudates were seen in the left eye. That similar myopic changes were found in the disk, the macula, and in the paramacular area, which is the center portion of the eyeball. That he gave him treatments, which treatments were to prevent the reformation

of further hemorrhages; that 20/200 is considered industrial blindness, and that in his opinion claimant was industrially blind in both eyes; that from said hypothetical question propounded to him, with taking into consideration the previous condition of the claimant, and the attack as testified to, that in his opinion the attack could have caused the hemorrhages seen in the left eye in the macula and paramacular area; that the hemorrhages which he examined and saw could produce a diminution in vision in the left eye; that in his opinion the hemorrhages were brought about in the claimant because of his age, with hypertension, and because of the trauma, and that the vision in his left eye was reduced as a result of said causes to 20/200; that the trauma could have produced the hemorrhages; that the hemorrhages could have been caused by hypertension, alone, without trauma; that the claimant by having vision in October of 20/40 and 20/50 in the left eye that said vision was increased by the hemorrhages clearing up; that in his opinion the hemorrhages found in his examination were new hemorrhages, and that he couldn't say whether they were related to the August 1, 1947 accident or not, but that they were new hemorrhages; that new hemorrhages are distinct in that, first of all, the color is different in a new hemorrhage; secondly, in an old hemorrhage you have secondary scar tissue formation formed after the absorption of the hemorrhage, because you see little white areas, which are evidences of scar tissue formation with the absorption of old hemorrhages; that he could see scar tissues in the eye from old hemorrhages; and the condition that he found with reference to the type of eyes that they would continue to deteriorate and not improve; that in the case of myopia, per se, if he has degenerative changes, he would not be able to

read a newspaper; that in his opinion from the condition found he was led to the opinion that all of the conditions found including the attack were factors playing a direct role in the final reduced acuity of the left eye.

It is significant that no claim was made for the loss of the sight of the right eye arising out of the attack when the record shows that Dr. Poslusny stated that the right eye had been improved to 20/60 after the cataract operation, and the left eye improved to 20/40; that three months later the same visibility occurred; that on August 2, 1947 when he examined claimant, that the vision of both eyes were the same, and it was not until October 7, 1947 that his examination disclosed that the vision in his right eye was 20/200, and the vision in his left eye 20/50. It is apparent that a deterioration or loss of vision had definitely occurred to the right eye, and was back to the same visibility as after the cataract operation. However, claimant makes no contention that this loss of vision or deterioration in the right eye was caused as a result of the attack.

From the medical testimony in this record it is apparent that there is a difference of opinion with reference to the cause of the reduced vision of the claimant. It seems that the entire record is devoted to the condition of the left eye, and that no testimony has been directed to the condition of the right eye with reference to how the attack affected it, although vision was definitely worse than that of the left eye.

All of the doctors agree that myopia, per se, and hypertension with heart disease would cause hemorrhages in the eyes; that the claimant's eyes were in a degenerative process as a result of the above named thing, and that the conditions could have resulted in the things without trauma.

It appears to the Court that the burden is upon claimant to establish by a preponderance of the evidence his right to compensation, to show where the claimant has a pre-existing disease, that that disease is aggravated or accelerated in the course of the employment by accidental means. (*MacLeod* v. *State of Illinois*, 17 Court of Claims, page 167 at 170 and 171.) The right to compensation could not be based upon speculation, surmise or conjecture.

Viewing the record as liberally as possible so as to accord to the claimant every benefit under the Workmen's Compensation Act, we are unable to conclude that claimant has proven that the accident sustained by him on August 1, 1947 aggravated or accelerated his previous condition with reference to his eyes. From Dr. Perritt's own testimony, it can be readily deducted that the examination made by him on June 9, 1948 was predicated upon hemorrhages that were new, and could not have been hemorrhages on August 1, 1947. This is borne out by the fact that Dr. Pearlman testified that when he examined claimant on October 3, 1947 that no hemorrhages were reported.

For the reasons above stated, the award in this case is denied.

The testimony on hearing before Commissioner Young was taken and transcribed by A. M. Rothbart, who has submitted a statement of $195.40 for his services. This charge is reasonable and proper.

An award is made in favor of A. M. Rothbart for stenographic services in the amount of $195.40, which is payable forthwith.

Claim of Stephen Mego is denied.

This award is made subject to the approval of the Governor, as provided in Section 3 of "An Act concern-

ing the payment of compensation awards to State employees.''